[Civ. No. 293. Third Appellate District.—May 27, 1907.]

H. J. CARSTENBROOK and J. D. CARSTENBROOK, Co-partners, etc., Respondents, v. W. A. WEDDERIEN and MARY J. WEDDERIEN, Appellants.

LEASE—LIEN OF LESSEE FOR ADVANCES—PREVENTION OF CROPS—ACT OF GOD—RECOVERY BACK OF ADVANCES.—Where, by the terms of a lease, the lessees were to farm the land leased for crops of grain and hay, and to make a specified advance to the lessors, and thereafter a monthly sum on demand, and all advances made were to be a lien on the lessors' share of the crops with interest when harvested, and where, after using all possible endeavor to raise crops thereon, the crops were prevented and wholly destroyed by the act of God, through the agency of floods, the lessees were not bound to make any further advances on demand, and were entitled before the expiration of the lease to sue to recover back the amount of advances made with interest.

ID.—SUFFICIENCY OF FINDINGS—PASTURAGE OF STOCK—COUNTERCLAIM BY LESSORS.—*Held,* that the findings for the plaintiffs sufficiently cover all of the material issues raised by the pleadings; and when the court found that no crop of hay could be raised or cut upon the land, and that, after the flood, a very small quantity of grass grew thereon, mixed with weeds, on which sheep and cattle could be and were pastured by plaintiffs for a limited time, the plaintiffs were entitled to such pasturage, and findings that plaintiffs were entitled thereto, and that defendants take nothing by their counterclaim for the alleged value thereof, sufficiently respond to the issues raised by the counterclaim.

APPEAL from a judgment of the Superior Court of Yuba County, and from an order denying a new trial. Eugene P. McDaniel, Judge.

The facts are stated in the opinion of the court.

W. S. Johnson, and W. H. Carlin, for Appellants.

M. T. Brittan, and J. E. Ebert, for Respondents.

HART, J.—This action is brought by plaintiffs to recover the sum of $591, together with interest thereon at the rate of eight per cent per annum, alleged to have been loaned and advanced to defendants under and by virtue of the terms of a certain written agreement of lease entered into between the parties, involving the leasing of certain lands to plaintiffs by defendants. A jury was waived by the parties and the case tried by the court. Plaintiffs were awarded judgment for the sum of $659.86, which includes the principal sum sued for and interest in the sum of $68.86. Defendants take this appeal from said judgment and an order denying their motion for a new trial.

By the terms of the said written agreement or lease, which was executed by the parties on the twenty-first day of January, 1904, the defendants leased to the plaintiffs certain real property, situated in Yuba county, said lease to take effect on and from the said date of its execution and to continue in force until and including the twenty-eighth day of September, 1904. It was provided in the lease that the plaintiffs should have the option, upon the expiration of the term thus expressly agreed upon, of extending the term of their

lease of said lands for a further period of four years. The
lease is made a. part of the complaint and is set out *in haec
verba* in the findings, and so much thereof as may be necessary
to an understanding of the issues presented by the pleadings
reads as follows:

"Upon the following terms and conditions, to wit, said
second parties will at all proper times and seasons during the
term of this lease, and according to the terms of good hus-
bandry practiced in the neighborhood, crop said lands and
premises to grain and hay and such other crops as they shall,
in their sound discretion, deem advisable; that they will
carefully plant, care for, protect and harvest all of said crops
without any expense to said first parties except for sacks, as
hereinafter mentioned, and will deliver to said first parties,
or their order, within a reasonable time after said crops shall
have been gathered and harvested, subject to the lien for ad-
vancements made hereunder and to be made hereunder by
said second parties to said first parties, as hereinafter men-
tioned, at such place as said first parties shall designate in
the city of Marysville, one-third of all of said crops of grain,
said first parties to furnish at their own expense sufficient
sacks to contain their rental or share of one-third of all crops
of grain grown and harvested upon said lands under the
terms of this lease; and said second parties will further de-
liver to said first parties, properly stacked on said premises,
one-third of all hay grown and cut upon said premises under
the terms of this lease.

"Said second parties hereby covenant and agree to pay to
said first parties, at the date of the execution of this lease,
the sum of two hundred and thirteen dollars ($213.00), and
upon the request and demand of said first parties the further
sum of fifty-four dollars ($54.00) on the first day of each
and every month commencing with the first day of February,
1904, during the period of this lease, that is, up to and in-
cluding the twenty-eighth day of September, 1904, and the
further sum of fifty-four dollars ($54.00), on the like request
and demand of said first parties, on the first day of each and
first day of September, 1908, if said period, or every month
thereafter, up to and including the term of said lease, be con-
tinued and extended to September, 1908, as hereinabove pro-
vided. Said sum of $213.00 and said sum of $54.00 to be
paid monthly as herein specified, shall be deducted with in-

terest as herein specified, by said second parties, when paid, from the one-third share of said first parties in the crops raised under the terms of this lease, and shall bear interest from the date of their several payments at the rate of eight (8) per cent per annum, and said sum with interest as aforesaid shall be and constitute a lien on said one-third portion of said crops reserved herein as and for rental for said first parties, in favor of said second parties, until the same, together with interest as aforesaid, be repaid by said first parties to said second parties, and should the total of said advancements, together with interest as aforesaid, in any season, exceed said lessors' (said first parties) share in the entire crops for said season, then in such event said first parties shall pay to said second parties the excess thereof received by them from said second parties.

"It is further agreed by and between the parties hereto that said advancements made and to be made hereunder by said second parties to said first parties, together with interest as aforesaid, shall be repaid by said first parties to said second parties at the harvest of said crops, in gold coin of the United States of America."

The complaint is verified. The answer admits that the plaintiffs paid to the defendants the sum of $591, but specifically denies all the other material averments of the complaint, and sets up a counterclaim upon a *quantum valebat,* for the sum of $1,000, alleged as the reasonable value of the use of the leased lands for the purposes of pasturage, to which use, it is alleged, it was converted by plaintiffs, said pasturage being, it is claimed, the sole and exclusive property of defendants.

It is insisted that the judgment should be reversed for two reasons: "1. Because the demands sued upon were not due when the action was commenced; 2. Because the findings do not cover all the material issues raised by the pleadings."

The action was commenced on the eighth day of August, 1904. A demurrer was sustained to the original complaint, and thereafter and on the sixth day of February, 1905, plaintiff filed an amended complaint which (a demurrer thereto having been overruled) tendered the issues of fact upon which the cause was tried. The court found from the evidence "that, pursuant to the terms of said agreement, said plaintiffs did, at the proper time, in the year 1904, and in accord-

ance with the terms of good husbandry as practiced in the neighborhood in which said lands are situated, carefully crop and plant said lands and premises to grain and hay, and did carefully care for and protect said crops during the said year 1904, and that thereafter and during the said year of 1904, and before the time for harvesting the said crops, the whole of said crops were totally destroyed·by an act of God and without any fault or neglect of said plaintiffs, or either of them, and as a result thereof there were no crops, or any crop, to harvest upon said lands and premises described in said agreement during said year of 1904." The court was fully warranted in making this finding from the evidence received. The plaintiffs testified that, having entered into the possession of the lands referred to in the lease between the 10th and 15th of February, 1904, they at once proceeded to plow the arable or tillable portions thereof, preparatory to seeding and cultivating the same in obedience to the covenants and conditions of the lease. The property, or the "ranch," as in common vernacular it is designated, embraces some three hundred and ninety-three acres of land, of which two ·hundred and five acres are "farming" lands, or lands adapted to and suitable for the cultivation of cereals. Approximately one hundred and forty acres of the land were plowed, the balance being too wet to undergo that process to any practical purpose. A short time thereafter heavy rains came, the water in the Feather river, on which the lands are situated, rose to such an extent as to overflow its banks and the flood waters inundated a large part of the land, the same remaining thereon so that the land could not be utilized for farming purposes for a long period of time. The plaintiff H. J. Carstenbrook testified: "Sometime in May I sent my teams there again and summer-fallowed eighty-five acres, on the north side of the road, and also a piece on the south side that had been winter plowed. All told, I replowed about one hundred and fifteen acres during that year after I had entered into the lease. I made two plowings that year on the place. After the first plowing, I did not sow the piece on the south side of the house, next to the levee, because I could not get on it, because of the water on it. The other part I had just seeded to barley, when the water came up on it. This was about seventy acres. There were about eighty-five acres in the whole piece, but I did not seed ten or fifteen acres of it be-

cause it was too wet. About eighty-five acres I plowed the second time. The portion of the land north of the house, about eighty-five acres, I seeded to barley twice and the water came up and drowned out both times. The water came up the second time about the 28th of March and remained over it fully three weeks and probably longer, and the ranch was not at any time afterward in such condition that it could have been cropped.'' This witness also testified to having had twenty-two years' experience in the business of farming in Sutter and Yuba counties. He stated that after the water had finally subsided and receded from the land there was nothing left ''but a water hole,'' and that it was not possible under the conditions then existing to cultivate a crop of any character; that there was no volunteer crop in that year upon the one hundred and fifteen acres, which were replowed and summer-fallowed; that the vegetation on the land after the floods was not such as could be made into good hay, and that, therefore, he turned about two hundred and eighty-eight head of sheep and eight or nine head of other live stock upon the land, and thus, from the latter part of June or the 1st of July to a short time before the 28th of September, used said land ''off and on'' for pasturage purposes. He testified that he and his coplaintiff had under lease at the time an adjoining farm, on which they also pastured their sheep and other cattle, alternately running them on the land leased from defendants and then on the adjoining land mentioned. The other plaintiff, J. D. Carstenbrook, corroborated the testimony thus given by his partner and coplaintiff as to the unfavorable conditions with which they were confronted in an effort to cultivate the land in accordance with the terms of the lease and their failure to do so for the reasons stated by the first-named witness, and also upon the point that the grass or vegetation on the land after the flood waters had receded and it was too late to do anything in the way of seeding the land in wheat and barley or either was unfit to be profitably mown for hay. Some five or six other witnesses—farmers residing and who had for many years lived and farmed in the neighborhood of the land in question—gave testimony corroborative of that given by plaintiffs. All of them testified that plaintiffs, by the exercise of the most prudent husbandry, did their utmost to cultivate and grow suitable crops upon the land, but failed because of the intervention of unfavorable

climatic conditions; that, under the circumstances, it was impossible to crop the land; that there grew upon the land after the water from the overflow of the river had disappeared "dog-fennel" and other weeds unfit even for the purposes of pasturage; that, while there was a small quantity of grass growing on the land upon which sheep and other cattle could thrive for a very limited time, it was measurably insignificant and in consequence, for purposes of hay, not worth its cutting. In fact, the testimony of these witnesses was uniform upon the point that a crop of hay could not have been cut from the land after the recession of the waters of the overflow. From the conditions existing and as thus briefly described, it was manifestly impossible to have cultivated and advanced to a state of fruition any kind of a crop upon the land, and, therefore, it irresistibly followed that the terms upon which the plaintiffs took possession thereof under the lease could not be by them met and carried out. These conditions, as the court found and as the evidence conclusively demonstrates, were not brought about through the fault or the negligence or default of the plaintiffs, but were the consequences of the course of nature and resulting circumstances, to repel, overcome or control which is, of course, beyond the power of any known human agencies, except, perhaps, through efficient levee fortifications, constructed to guard against overflows of the flood waters.

Under the stipulations of the lease, as will be observed, the defendants, in consideration of transferring the possession and use of their land to plaintiffs, were to receive one-third of any and all crops grown and harvested by said plaintiffs, "subject to the lien for advancements made hereunder and to be made hereunder" by said plaintiffs. The latter, under the terms of the lease, advanced to defendants, upon the execution of the instrument, the sum of $213, and were to thereafter further advance to them on the first day of each month the sum of $54, "commencing with the first day of February, 1904, during the period of this lease, that is, up to and including the twenty-eighth day of September, 1904," said advances to be made "upon the request and demand" of said defendants.

The contention is that the action was prematurely brought, because the plaintiffs defaulted in making the last advance

5 Cal. App.—39

of $54—that is, the advance which they would have been required to make upon demand of defendants if the land had been successfully farmed. In other words, the sum of $54 not having been advanced or loaned to appellants for the month of September, no right of action accrued to respondents for the total amount already so received by defendants. The contention is, in our opinion, wholly without any reason for its support. Upon the question of the time of repayment, the agreement is in no sense obscure. It provides that said "advancements made and to be made hereunder by said second parties, together with interest as aforesaid, shall be repaid by said first parties to said second parties *at the harvest of said crops,* in gold coin," etc. It certainly would not be attempted to be maintained that this clause of the lease means that the money should not be returned until crops had been actually harvested, and it is not so contended. The proper and the only true construction of it is that the money should be repaid at that time of the season when crops, if there were any, should be harvested, or at any other time, we think, when it could become a certainty or settled fact that it was impossible, from the inordinate quantity of water from the river overflows covering the land, to grow crops thereon. The evidence shows that it was plainly apparent to the parties to the lease, at and before the time at which crops should have been harvested upon the land had they been seeded and grown, that there was no possibility of securing crops from the land, and, in consequence, no possibility of the receipt by the defendants of the compensation to which they would have been entitled had the season been more propitious. The conditions upon which the land was leased necessarily involved returns to both parties from their investment, as it may properly be styled, as indeterminate, uncertain and problematical, as must be usual to enterprises which, like this, are required to depend, as among the prime factors essential to their prosperousness and final success, upon favorable meteorological and other conditions. Each of the parties, in other words —the defendants as well as the plaintiffs—by their written covenants, manifested, mutually, a willingness to take a chance of reaping the benefits which ordinarily attend such a venture, and of suffering together the disadvantages and losses which the interference of adventitious circumstances too often bring to it. The termination of the lease was fixed

for the latter part of September, in order, without doubt, that the entire harvesting season would thus be included in and covered by the lease, thereby giving plaintiffs full opportunity to properly gather whatever crops they might deem it the part of wisdom to grow. There is nothing in the language of the lease, reasonably construed, which bound plaintiffs to advance the $54 a month after it became certain that there could be no possible hope or expectation of harvesting a crop of any character from the land. The moneys received by defendants from plaintiffs were, it is admitted, mere loans, to secure repayment of which it was agreed that plaintiffs should retain, until their accounts were adjusted, the share to which the defendants, by the terms of the lease, would be entitled, of any crops which might be harvested upon the land. That point or stage of the season having been reached where it must have been absolutely clear to both parties that no crop of any kind whatsoever could be gathered from the land, owing to the unfavorable conditions which existed, by what process of reasoning can it be maintained that, under the terms of the lease, interpreted agreeably to reason, the plaintiffs were in no position to sue for advances already made, because they had not made the further loan of $54, which they would probably have been required to make in the event that the land had been successfully cropped? The lease may well be construed as obligating plaintiffs to make the loans to defendants as stipulated therein so long as there existed a prospect or hope of realizing some returns from the cultivation of the land in the manner agreed upon, and that when the time arrived that any reason for such prospect or hope ceased to exist, then the obligation to make such advances ceased to be binding or of any force. We can conceive of no reason, under a fair interpretation of the language of the lease, why the plaintiffs should have been forced, before acquiring a right to sue for moneys already loaned to defendants, to go through the form of advancing a further sum of $54. The logic of the argument may be stated thus: "We owe you, it is true, the sum of $590," say the defendants, "but you have no right now to sue us, nor can you ever acquire any such right until you have made the advance to us of the further sum of $54. The reason for such further loan has, of course, ceased to exist, but we are, nevertheless, under the

strict letter of the lease, entitled to a further advance of $54. When you have thus carried out your part of the agreement, you are then authorized to, and have the legal right, immediately thereafter to sue us, not only for the last advance made, but for the whole amount loaned to us." This, it seems to us, is the necessary effect of the argument, and the proposition is obviously a *reductio ad absurdum*.

We think the findings sufficiently respond to and include all the material issues tendered by the pleadings. The specific complaint upon this point is that the court omitted to make any finding upon the issue involved in the alleged counterclaim set up by the defendants to the effect that "during the period of the lease plaintiffs used the leased premises for pasturage purposes solely," etc., and that "the reasonable value of this pasturage was the sum of $1,000." The findings of the court upon this question is as follows: "That said plaintiffs, under the terms of this agreement, are entitled to all of the pasturage on said land during the terms of said lease, and that said defendants take nothing by reason of their counterclaim." This finding is sufficient to cover the issue to which it relates. It appears to be clear enough to require no amplification or explanation to comprehend its meaning. The plain meaning of it is (and it can be construed as meaning nothing else) that the pasturage on the land was the property of plaintiffs, and that, therefore, the claim of defendants that it belonged exclusively to them, and that they were entitled to damages in any sum from plaintiffs for taking and using it is without any foundation in fact. The authorities cited by counsel are where no finding whatever was made upon a certain material issue raised by the pleadings, or even an attempt to make one.

The grounds upon which the motion for a new trial was based and urged here upon appeal from the order practically call only for a discussion of the questions presented on the appeal from the judgment, and which we have considered. Counsel insist that the court erred in refusing to grant the motions of defendants to dismiss the action and for judgment on the pleadings, and also in denying their motion for a nonsuit, but the questions arising thereon, as suggested, have been disposed of in the discussion of the points urged on the appeal from the judgment.

The plaintiffs were, we think, entitled to the use of the pasturage and feed growing upon the land. There is no provision in the lease reserving to the lessors the right to the pasturage, and unless such right was withheld from plaintiffs, who were tenants for years, by the terms or some covenant of the lease, the plaintiffs were acting within their rights when they grazed their stock upon the land. (Civ. Code, sec. 819; *Marshall* v. *Luiz,* 115 Cal. 625, [47 Pac. 597].) Of course, it should be unnecessary to say that, if the lessees had succeeded in growing upon the land a crop of hay, or of barley or of wheat, worth harvesting, in point of quantity and quality, they would not have been justified in entirely appropriating the same for pasturing of their stock or otherwise, without accounting to the defendants for their share thereof. But we feel convinced from the testimony adduced at the trial that, after the disappearance of the flood waters from the land, the vegetation growing thereon which was at all capable of utilization was, even for the purposes of pasturage, of comparatively little value, and that the consequence of gathering it, if, indeed, it was in such condition as to have rendered it practicable to reap it, considering the cost and labor required to do so, would have been loss rather than profit. The evidence indisputably establishes the fact that the plaintiffs, who are experienced farmers, and who, from having been engaged in the business of farming for many years in the section of the state where the leased lands are situated, must be thoroughly familiar with the methods and requirements of successful farming in that locality, unremittingly strove to cultivate and grow crops upon the property, as they agreed to do, by the covenants of the lease. There was no sane reason why they should not have done so. They had equal concern with the defendants in the success of the venture, for their failure because of negligence or for any other reason within their control to make the business prosperous and profitable could not result otherwise, quite naturally, than to militate against their own welfare, as well as against that of the defendants.

We have carefully consulted all the authorities cited by counsel for appellants as sustaining their several contentions, and readily concede that they contain declarations of sound law, but are unable to perceive their application to the facts

presented in the case at bar. We can find no reason for disturbing the judgment or the order.

For the reasons stated in the foregoing discussion, the judgment and order appealed from are affirmed.

Burnett, J., and Chipman, P. J., concurred.